# TERRITORY *v.* WILLIE MEYER AND KAMOHAI.

## No. 890.

ERROR TO CIRCUIT COURT, FOURTH CIRCUIT.

HON. C. F. PARSONS, JUDGE.

ARGUED JANUARY 3, 1916.                    DECIDED JANUARY 27, 1916.

ROBERTSON, C.J., WATSON, J., AND CIRCUIT JUDGE ASHFORD
IN PLACE OF QUARLES, J., ABSENT.

LARCENY—*opinion evidence—weight of cattle.*

The weight of an animal alleged to have been stolen may be properly shown by a witness who had seen the same and who from his practical experience could testify to the weight.

SAME—*value—competency of witness.*

If a person shows that his business is such that by commercial reports, newspapers or other means of like nature he is familiar with the market prices of an article, and his recollection of such prices is independent of such market reports, newspapers or his books, the same need not be put in evidence, but the witness may testify the result of his examinations as he might the result of inquiries in the market places.

EVIDENCE—*failure to produce—inference.*

Where material evidence is equally available to both parties, a failure to produce is open to an inference against both parties, the particular strength of the inference against either depending on the circumstances.

OPINION OF THE COURT BY WATSON, J.

The plaintiffs in error were convicted by a jury under an indictment which charged that they, together with one Haimende, alias Jaime Mendez, on the 12th day of April, 1914, "did unlawfully and feloniously steal, take and carry away certain thing of marketable, saleable and available value, to wit, one steer of the aggregate value of sixty dollars, the same then and there belonging to and being the property of W. H. Shipman, and did then and there and thereby commit the crime of larceny in the first degree." By section 3918 R. L. 1915 larceny is defined as follows:

"Larceny or theft is the feloniously taking any thing of marketable, saleable, assignable or available value, belonging to or being the property of another."

Section 3932 R. L. 1915 provides as follows:

"Larceny is of two degrees, first and second. Larceny of the property of the value of more than fifty dollars is in the first degree, and shall be punished by imprisonment at hard labor not more than ten years.

"All other larceny is in the second degree, and shall be punished by imprisonment at hard labor not more than one year, or by fine not exceeding one thousand dollars."

A *nolle prosequi* having been entered by the prosecution as to the defendant Haimende the case proceeded to trial against the remaining defendants (plaintiffs in error herein). At the first trial of the action the jury failed to agree on a verdict and a mistrial was entered. At the second trial the jury found both of the defendants (plaintiffs in error herein) guilty as charged in the indictment. At the trial there was evidence tending to prove that the defendant Meyer is the son of a butcher living at Waipunalei, North Hilo; that he was the man in charge of a small ranch which adjoins the Parker ranch on one side and the Shipman ranch on the other; that Kamohai was a cowboy in the employ of Meyer for some years; that on Sunday,

April 12, 1914, the defendant Meyer ordered Haimende, a Porto Rican, also employed by Meyer, to go with him and Kamohai; when the three got to a place about eleven miles mauka of the government road Kamohai took down the five-wire fence which formed a partition between the two places; Meyer then went on to the Shipman land and attempted to rope a fat steer belonging to Shipman, but being unsuccessful called to Kamohai who caught the steer; these two took the animal on to the Meyer land, where it became disabled by breaking its leg; the fence was restored to its original condition, and night coming on the three went to the Meyer ranch house; the following morning at about nine o'clock the three returned to the scene for the purpose of butchering the animal; while there one of Shipman's employees came down the fence and Kamohai and Haimende ran away and Meyer secreted himself behind a bush near at hand; his dog remained near him, and this, together with the horses which the defendants were riding, gave the clue which was followed up and led to the discovery of the three; Meyer and Kamohai, shortly after their arrest, both made written statements to the arresting officer admitting the taking of the steer and indicating no defense; these written statements were offered and received in evidence without objection on the part of the defendants; after making his written statement Meyer was asked by the deputy sheriff why he went to the Shipman ranch and took the steer and he flippantly said that he wanted to get a good fat steer; after the indictment for larceny in the first degree had been presented there was a mistrial; in the meantime Meyer, while awaiting trial on this indictment, stole another Shipman steer and was convicted and had served his sentence. At the trial of the present case Meyer and Kamohai admitted the taking of the animal, but claimed that in doing so they were of the opinion that the animal belonged to one

Suerra, whose cattle Meyer had the right to take; in other words, that the taking was a mistake. This was the principal, if not the only, defense on the merits. There was ample evidence to warrant the jury in finding that the taking was a felonious one, and by their verdict they found against the mistake theory. The defendants made an effort to convince the jury that the stolen animal was of the value of less than $50, the effort being for the purpose of reducing the grade of the crime to that of second degree. Practically all of the assignments of error relate to the value of the stolen animal.

Dr. Shutte, a veterinary surgeon in charge of the Shipman ranch as manager, who had had many years experience as a rancher in the cattle raising business, gave it as his opinion that the animal would weigh 550 pounds dressed. The owner, W. H. Shipman, was able to estimate the weight of the animal from the hide and statement of its condition. Mr. Shipman was admitted by counsel for the defendants to be an expert in the cattle ranching business. He gave the weight as being 550 to 555 pounds. It appeared from the evidence that the price of dressed beef is determined by the Honolulu market and that beef at the time of the larceny was 10½c per pound in Honolulu; generally there is a difference of one-half to one cent per pound at Hilo, the point of shipment. At the time of the larceny, however, it appeared from the evidence of Mr. Shipman that the price was the same (10½c). Mr. Shipman testified that the cost of driving the animal to Hilo would be about $1.25, and that the loss in weight, resulting from the driving, would be 25 or 30 pounds; that by deducting the cost of driving the animal to Hilo and the loss of weight the dressed beef of this animal would be worth (at the point where it was taken from the Shipman ranch) between $55 and $60. The defendant Meyer gave his estimate of the weight of the animal as being 450 pounds

dressed weight; that it was "pretty fat." He further testified that the value of fat beef at Waipunalei was 9c per pound.

Perhaps the principal assignment relied on by the plaintiffs in error in this court, and the only one orally argued, is (No. 9) that the circuit court erred in overruling defendant's motion to strike the testimony of W. H. Shipman relating to a certain hide which he saw at the police station at Hilo, it being the contention of the defendants that the hide testified to by Mr. Shipman was not sufficiently identified as the hide of the animal alleged to have been stolen. It appears from the transcript that Mr. Shipman, when called as a witness for the prosecution, testified on his direct examination that shortly after the steer was taken, "It may have been two weeks or less, a week, perhaps," he saw the hide of the animal at the sheriff's office in Hilo. Counsel for the prosecution, as appears by the record, then made the statement that he intended to call other witnesses "for the purpose of tracing the hide right down." The witness then being asked as to the condition of the hide at the time he saw it, objection was made by counsel for the defense on the ground that the evidence was incompetent, irrelevant and immaterial. The objection was overruled, the court stating "Upon counsel's agreement to connect it may be admitted." The witness then testified that the hide was red with a little sprinkle of brindle on the back; that it bore the Puuoo brand (the brand used by the witness on his ranch) as described in the testimony theretofore given by Dr. Shutte and illustrated by the witness Shutte on the blackboard in the presence of the jury; that the brand on the hide at the time he saw it was "plain enough;" that from an examination of the hide in its then condition he was able, from his experience as a rancher, to tell pretty well the weight of the animal, but

not its age; that the weight of the animal was somewhere from 550 to 555 pounds dressed weight.

The description of the hide given by the witness tallied fairly well with that given by another witness for the prosecution (Inaga), who testified that the animal alleged to. have been the subject of this larceny "was what the natives called moo-o, dark brown, brindle." The undisputed evidence shows that the hide of the animal alleged to have been stolen was taken away by the employees of Shipman and turned over to the police of the city of Hilo. This condition of the evidence was recognized by the defendants in their requested instruction (No. 5b), in which the court was asked to instruct the jury, *inter alia,* "that the undisputed evidence in this case shows that the hide of the said steer was taken away by the employees of W. H. Shipman, the owner of the said steer, and afterwards turned over to the police of the city of Hilo, and that the said hide was in the possession of the police until within a few days before the present trial of this cause." Subsequent to the testimony given by the witness Shipman, Dr. Shutte, on being recalled as a witness for the prosecution, testified that the hide of the animal alleged to have been stolen was salted and taken to Hilo, and that he pointed out that hide to Mr. Shipman. There was no denial of the fact that the hide testified to by Mr. Shipman was that of the stolen animal, and the evidence nowhere raises any doubt concerning it.

We think the contention of the defendants, that the hide testified to by the witness Shipman was not sufficiently identified, is without merit, and that the motion to strike his testimony was properly overruled.

Assignments 1 and 2 complain of the rulings of the trial court that Dr. Shutte, the manager of the ranch, was competent to estimate the weight of the steer. This witness had seen the animal after it was roped and its leg broken

by the defendants. He testified that the animal was about thirty months old, was fat, and that its dressed weight would be about 550 pounds. The witness had been manager of the Shipman ranch for about eight years, was a veterinary surgeon by profession, and. had had experience in handling beef and milk cattle since 1899. He testified that he was in the habit of estimating the weight of animals by looking at them; that all experienced cattle men could do that; that cattle were usually shipped from the Shipman ranch in lots of 75 or 80 to Honolulu and that the shipments to Hilo varied in number; that he kept a record of the average weights on each shipment and that he could correctly estimate the weight of an animal within fifteen or twenty pounds. This evidence was properly admitted. As was said by the supreme court of Massachusetts in the case of *Carpenter* v. *Wait,* 11 Cush. 257, 258:

"The fact of the weight of the cattle might be shown by the opinion of witnesses, who had seen the same, and who, from their practical experience could testify to their weight. This species of evidence would, of course, be much inferior to that derived from the actual weighing of the cattle, but in the absence of that, it would be an approximation to the actual weight, proper for the consideration of the jury."

The experiential capacity of the witness, as testified to by him, was in our opinion, ample to qualify him to give opinion evidence as. to the weight of the steer. *Pacific Mill Co.* v. *Enterprise Mill Co.,* 16 Haw. 282; Wigmore on Evidence, Sec. 559, et seq.

The third assignment is to the refusal of the court to permit the defendants, on their cross-examination .of the witness Shipman, who had testified on direct examination that the price of beef was determined by the Hawaiian Meat Company of Honolulu, to go into the relations of that company and the various ranches on Hawaii. . The

witness having testified that he had no general agreement
with the Hawaiian Meat Company touching the price of
beef, evidence as to whether or not the ranchers on the
Island of Hawaii were members of the Hawaiian Meat
Company was properly excluded, upon the objection of
the prosecution that such evidence was immaterial.

Other assignments go to the action of the trial court in
refusing to require the witness Shipman to produce his
books and records showing the price of beef for the month
of April, 1914. This witness had testified on his direct
examination that he had been in the cattle business for
38 or 39 years; that he had a place of business, a market
at Hilo, where he was then engaged in selling beef at whole-
sale only; that years ago he used to sell at retail; that he
kept track of prices both at Honolulu and Hilo; that from
his own knowledge of the Hilo market, and from the prices
he got and kept run of in Honolulu, the market price at
the time the animal was taken was 10½c per pound, and
that its value was 10½c per pound; that generally there is
a difference of from one-half cent to one cent per pound
in the Honolulu and Hilo prices, but at that time there
was no difference; that as the animal stood on the land at
Honohina, before it was roped and its leg broken, it was
worth between $55 and $60; that he gained his information
as to market values at Honolulu from reports and from
market quotations in Honolulu newspapers. He testified
that his information relative to the market price of beef
during the month of April, 1914, was obtained from general
sources, in the regular course of business, and from quota-
tions given in the market reports contained in the news-
papers; that he had an independent recollection, without
reference to any books or papers, as to the market price
of beef in Hilo and Honolulu in April, 1914; that the price
in both places was 10½c per pound. In this state of the
evidence the court ruled: "It appearing that the witness'

recollection now is not based upon his books, the motion to produce is denied." The ruling of the trial court was in our opinion correct, and is sustained by the authorities.

"Value in a business sense consists largely of the opinions of persons familiar with the market, and these opinions are largely made up of what is said and reported by others. Hence, if a person shows that his business is such that, by commercial reports or other means of a like nature, he is familiar with the current market prices of an article, he is competent to testify on the subject, although he may not have actual personal knowledge of any particular sales. *Brackett* v. *Edgerton,* 14 Minn. 174, (Gil. 134;) Whart. Ev. §§ 255, 449." *Hoxsie* v. *Empire Lumber Co.,* 41 Minn. 548, 43 N. W. 476.

"That case does not require that the newspapers themselves should be put in evidence, but it recognizes them as a proper source of information, to which persons interested in the markets may resort; and there is no reason why they should not testify the result of their examinations, as they might the result of inquiries in the market places." *Cleveland & Toledo R. R. Co.* v. *Perkins,* 17 Mich. 296, 300. See also *Smith* v. *R. Co.,* 68 N. C. 107, 116; *Sirrine* v. *Briggs,* 31 Mich. 443, 446.

The defendants complain of the action of the trial court in refusing to give their requested instruction No. 5b, reading as follows:

"Upon the question of the brand or brands which the steer alleged to have been stolen bore you are instructed that the undisputed evidence in this case shows that the hide of the said steer was taken away by the employees of W. H. Shipman, the owner of the said steer, and afterwards turned over to the police of the city of Hilo, and that the said hide was in the possession of the police until within a few days before the present trial of this cause. In this connection you are charged that the hide itself would be evidence of the brand or brands which it bore & the clearness or lack of clearness of the same and the failure of the prosecution to produce the same for your inspection, unless the failure to do so has been satisfactorily explained to you, gives rise to the natural inference that

the prosecution fears to produce the said hide for your inspection, and this fear is some evidence that the hide, if produced, would have exposed facts unfavorable to the prosecution. The non-production of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its production would be unfavorable to the party's cause;"

and to the giving by the court of an instruction as follows:

"The hide in this case is in the possession of the prosecution, but it is equally available for evidential purposes to the prosecution and defense. You may take into account its non-production, together with the explanation as to why it was not produced, and you may infer, if the explanation is not satisfactory, or if there is no explanation, that the prosecution feared to produce it or that the defense feared to produce it, as the facts proved may warrant."

The undisputed evidence showed, and it was apparently conceded at the trial, that the hide of the animal alleged to have been stolen was in the possession of the police of the city of Hilo, where the trial took place, and that it was equally available for evidentiary purposes to the prosecution and defense. The evidence of the witnesses for the prosecution (Shipman and Shutte), which was received without objection, was that the Shipman brand on the hide was plain, while the defendant Meyer, in support of his claim that he took the animal under the mistaken belief that it was one of the Suerra steers, which he had the right to take, testified that the brand was not very plain and was covered with long hair so that one could just see it. The hide itself was not produced, the only explanation offered for its non-production being the testimony of one of the witnesses for the prosecution that it was so putrefied that its production in court would be offensive to the court and jury. The testimony of the witnesses for the prosecution as to the condition of the brand was not objected to on the ground that such testimony

was not the best evidence, nor upon any ground, nor was there any notice to produce given. Defendants' requested instruction was properly refused, as, if any inference could be properly drawn by the jury from the non-production of the hide, the inference was equally available against either party, as it appears from the record that the evidence was accessible to both.

The correctness of the instruction as given presents a question of more difficulty, as the general rule is that no inference is allowable where the evidence in question is equally available to both parties. *Indemnity Co.* v. *Perkins* (Ark.), 98 S. W. 709, 710; 22 A. & E. Ency. Law (2d Ed.) 1262; *Cross* v. *Ry. Co.*, 69 Mich. 363, 369. This rule, however, does not appear to be an absolute one, many courts of high standing having declined to adopt or strictly enforce it. In *Harriman* v. *R. Co.*, 173 Mass. 28, 53 N. E. 156, the supreme court of Massachusetts held that the inference to be drawn from the failure to call a witness available to both parties should be left to the jury upon all the circumstances; in *Mitchell* v. *R. Co.*, 68 N. H. 96, 117, 34 Atl. 674, it was held that either party was entitled to argue as to the inference deducible from the failure to call witnesses available to both. Professor Wigmore, in his excellent work on evidence, Sec. 288, says: "The more logical view is that the failure to produce is open to an inference against both parties, the particular strength of the inference against either depending on the circumstances." We think this view the correct one, and applying it to the case at bar the instruction given by the court was free from error. The jury were not instructed that they were bound to draw an inference unfavorable either to the prosecution or the defendants from the failure to produce this particular evidence, nor was the weight to be given to the circumstance made the subject of sug-

gestion to the jury (*United States* v. *Schindler,* 10 Fed. 552).

Bearing in mind the fact that both the prosecution and the defense had introduced testimony (secondary evidence, it may be, but not objected to,) as to the condition of the brand on the hide, and that this was a material fact then in issue, if the production of the hide before the jury would have aided either party such party would probably have produced it. The jury were properly instructed as to the burden of proof, and that a taking by mistake under a *bona fide* claim of right would not constitute larceny. Reading the charge as a whole we are of the opinion that under the facts in this case the giving of the instruction complained of was not error.

The remaining assignment goes to the action of the trial court in overruling defendants' motion for a new trial. This assignment is disposed of by what has been already said.

The judgment of the circuit court is affirmed.

*Harry Irwin* (*T. E. M. Osorio* with him on the brief) for plaintiffs in error.

*C. S. Carlsmith* (*W. H. Beers,* County Attorney of Hawaii, and *S. S. Rolph,* Deputy County Attorney of Hawaii, with him on the brief) for the Territory.